AO 91 (Rev. 11/82)　　　　　　　　　　**CRIMINAL COMPLAINT**

FILED
CLERK, U.S. DISTRICT COURT
JUN - 7 2017
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>FELIPE TALAMANTE and MIGUEL ANGEL TALAMANTE | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**17-1437M** |

Complaint for violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE STEVE KIM | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>May 17, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)]

On or about May 17, 2017, in Los Angeles County, within the Central District of California, defendants FELIPE TALAMANTE and MIGUEL ANGEL TALAMANTE knowingly and intentionally possessed with intent to distribute at least five kilograms of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JASON GERTLER**　/S/<br>OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>**STEVE KIM** | DATE<br>June 7, 2017 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Joseph D. Axelrad x7964　　REC: Detention

## AFFIDAVIT

I, Jason F. Gertler, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrant for FELIPE TALAMANTE ("FELIPE") and MIGUEL ANGEL TALAMANTE ("MIGUEL") violations of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(A)(viii) (Possession with Intent to Distribute Cocaine).

2.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. TRAINING AND EXPERIENCE

3.  I am a Special Agent ("SA") for the Drug Enforcement Administration ("DEA") and have been so employed since November 2006. I am currently assigned to the Los Angeles Field Division, Southwest Border-3, which is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale narcotics trafficking. I have previously worked with several other multi-agency task forces that investigate large-scale drug trafficking and money

1

laundering organizations. I have successfully completed the DEA Basic Agent Training in Quantico, Virginia, where I received several hundred hours of comprehensive, formalized instruction in such matters as narcotics identification, detection, trafficking and interdiction; money laundering techniques; and asset identification, seizure and forfeiture.

4. Prior to joining the DEA, I was a Deputy Sheriff at the Broward County Sheriff's Office in Florida for approximately nine and a half years, including approximately five and a half years as a patrol officer and approximately four years as a detective. During my employment with the Sheriff's Office, I conducted over 100 drug-related arrests, and investigated numerous violent and drug-related crimes in Broward County. During my experience in law enforcement, I have conducted and participated in multiple investigations involving the unlawful importation, transportation, and distribution of controlled substances, including but not limited to cocaine, crack cocaine, heroin, methamphetamine, and marijuana, as well as investigations involving money laundering.

5. In conducting these investigations, I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also participated in various aspects of these investigations, including conducting physical and wiretap surveillance, using informants and cooperating sources, executing search warrants, and making arrests. I am familiar with methods employed by large-scale narcotics trafficking

organizations and the tactics they use to evade law enforcement, such as the frequent changing of cell phones, the use of pre-paid calling cards, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, the use of false or fictitious identities, and coded communications and conversations.

### III. SUMMARY OF PROBABLE CAUSE

6. On or about May 17, 2017, a Confidential Informant ("CI") alerted law enforcement that FELIPE was capable of selling approximately 20 kilograms of cocaine.[1] Later that day, FELIPE met with the CI and California Department of Justice Agent Frank Cortez, who was working in an undercover capacity. During this meeting, FELIPE agreed to sell Agent Cortez 20 kilograms of cocaine for $430,000. On or about May 21, 2017, FELIPE called the CI and told the CI that 20 kilograms of cocaine was ready for sale to Agent Cortez. During a subsequent call, FELIPE and Agent Cortez agreed to conduct the sale on May 25, 2017, at FELIPE's house. On or about May 25, 2017, Agent Cortez and the CI met with FELIPE and his son, MIGUEL, at FELIPE's house, – which also appears to be used as an unlicensed children's day care center. Shortly thereafter, a car drove up to the house, FELIPE and MIGUEL approached the car, and MIGUEL pulled a black, weighted gym bag out of the front passenger seat

---

[1] The CI has been working with law enforcement for approximately 8 years and has been doing so in exchange for financial compensation. The CI's does not have a criminal history. Since the CI began working with law enforcement, he/she has consistently provided accurate and reliable information.

of the car. FELIPE and MIGUEL then took the bag into FELIPE's house. During the execution of the search warrant of the house, law enforcement found approximately twenty kilograms of cocaine.

## IV. STATEMENT OF PROBABLE CAUSE

**A. CI Introduced Undercover Law Enforcement Agent to FELIPE**

7. Based on my personal involvement in this investigation, as well as my conversations with other law enforcement officers, I am aware of the following:

    a. On or about May 17, 2017, at law enforcement's direction, the CI contacted FELIPE to inquire about a possible methamphetamine or cocaine transaction.[2] FELIPE agreed to meet with the CI and the CI's acquaintance, who, in reality, was an undercover law enforcement officer.

    b. At the direction of law enforcement, on or about May 17, 2017, the CI called FELIPE in order to set up an introduction with Agent Frank Cortez of California Department of Justice.

    c. At approximately 11:20 a.m., FELIPE called back and spoke with the CI. The CI explained to FELIPE that he/she had a client, "Angel" (the pseudonym used by Agent Cortez in his undercover capacity), for him to meet. The CI explained to Felipe that Frank Cortez is in town from San Francisco and was looking to purchase methamphetamine and possibly cocaine. During the conversation, the CI and FELIPE agreed to meet on the

---

[2] In September 2016, at the direction of law enforcement, the CI purchased approximately one pound of methamphetamine from FELIPE during an audio recorded transaction.

4

morning of May 19, 2017 at 4702 N. Figueroa St., Los Angeles, California.[3]

   d. On or about May 19, 2017, the CI and Agent Cortez arrived at 4702 N. Figueroa St. Law enforcement agents were present to conduct surveillance.

   e. At approximately 10:50 a.m., FELIPE arrived in a dark gray 2006 BMW, with a California License Plate of 5PPA853, and parked nearby where the CI and Agent Cortez were waiting.

   f. FELIPE got out of his car and introduced himself to Agent Cortez. FELIPE, the CI, and Agent Cortez then spoke for approximately 35 minutes. During this conversation, FELIPE and Agent Cortez discussed the purchase of methamphetamine and cocaine. FELIPE stated, "Meth is a poor man's drug. My specialty is cocaine." FELIPE also told Agent Cortez that he (FELIPE) could provide him (Agent Cortez) with quality cocaine "direct" from Mexico. Ultimately, FELIPE and Agent Cortez negotiated the purchase of 20 kilograms of cocaine for $21,500 a kilogram and a total price of $430,000. FELIPE and Agent Cortez spoke about setting up the actual transaction for the following week at an unspecified time.

  8. Based on my personal involvement in this investigation, as well as my conversations with other law enforcement officers, I am aware of the following:

---

[3] The conversation between FELIPE, the CI, and Agent Cortez was recorded and in Spanish. Agent Cortez speaks fluent Spanish and he translated the conversation.

5

a. On or about May 21, 2017, at approximately 2:26 p.m., Felipe called the CI and told him/her that he had 45 kilos of cocaine ready and available to sell to Agent Cortez. FELIPE told the CI to have Agent Cortez call him on his cell phone to finalize the deal. Agent Cortez called FELIPE and confirmed the deal for 20 kilograms of cocaine and agreed to conduct the transaction on or about May 25, 2017.

B. **FELIPE and MIGUEL Meet with the CI and Undercover Law Enforcement Agent at FELIPE'S RESIDENCE for Sale of 20 Kilograms of Cocaine**

9. Based on my personal involvement in this investigation, as well as my conversations with other law enforcement officers, I am aware of the following:

a. On or about May 25, 2017, at approximately 11:30 a.m., FELIPE and Agent Cortez spoke by phone and agreed to meet at approximately 2:30 p.m. at FELIPE's residence. FELIPE texted Agent Cortez the address of his residence: "5215 Marmion Way, Los Angeles" ("FELIPE'S RESIDENCE").

b. On or about May 25, at approximately 2:30 p.m., the CI and Agent Cortez arrived at FELIPE'S RESIDENCE, after which the CI got out of the car and met with FELIPE and his son, MIGUEL, in the front yard of FELIPE's RESIDENCE. After several minutes, Agent Cortez got out of his car and met with FELIPE, MIGUEL, and the CI.

c. During their conversation, Agent Cortez noticed several children playing in the front yard of FELIPE's RESIDENCE. The children appeared to be between the ages of two

6

and seven years of age. Agent Cortez also noticed an orange car drive onto FELIPE's driveway, after which one of the children got into the car and it left. Approximately five minutes later, Agent Cortez noticed a blue SUV drive onto FELIPE's driveway, after which a boy of approximately 16 years of age got out of the SUV and walked towards the rear of FELIPE's RESIDENCE. The SUV then drove away.

        d.    After the SUV drove away, FELIPE and MIGUEL told Agent Cortez and the CI that a "Day Care Center" was operated in FELIPE's RESIDENCE. Indeed, throughout the day, law enforcement officers conducting surveillance observed children of all ages being picked up and dropped off at FELIPE'S RESIDENCE.

        e.    FELIPE, MIGUEL, and Agent Cortez began to negotiate the cocaine transaction, during which FELIPE explained that the cocaine was stashed at a nearby location and that he would call to have the cocaine delivered to his house. FELIPE then told MIGUEL to make a call and have the cocaine delivered.

        f.    MIGUEL then told Agent Cortez that he wanted him (Agent Cortez) to witness the call to the delivery person, who MIGUEL named as "German." MIGUEL made a phone call and told Agent Cortez that "German" would call him back.

        g.    As they waited, FEIPE and MIGUEL explained to Agent Cortez that they did not like to rush narcotics deals because they have previously been robbed of thirteen kilograms of cocaine. MIGUEL explained that it was safe to conduct the transaction at FELIPE'S RESIDENCE because they were familiar with the neighborhood.

h. After several minutes of waiting, Agent Cortez told FELIPE and MIGUEL that he and the CI would leave and return when the cocaine arrived. Agent Cortez and the CI left FELIPE'S RESIDENCE. During this time, FELIPE'S RESIDENCE was under continuous law enforcement surveillance.

i. At approximately 6:45, FELIPE called Agent Cortez and told him that the cocaine had arrived and they were ready to proceed with the transaction.

j. At approximately 6:50 p.m., law enforcement observed a white Honda Civic with California License Plate number 7SVZ697, arrive and park in the driveway of FELIPE'S RESIDENCE. Law enforcement saw a single Hispanic male in the car as it sat in the driveway of FELIPE'S RESIDENCE. Shortly thereafter, FELIPE and MIGUEL left the house and walked up to the white Honda Civic where MIGUEL reached through the right front passenger window of the car and grabbed a large, black, gym bag that appeared to be heavy. MIGUEL and FELIPE then walked back to FELIPE's RESIDENCE, with MIGUEL hunched over in order to carry the gym bag. Both FELIPE and MIGUEL entered FELIPE's RESIDENCE.

C. Search of FELIPE'S RESIDENCE

10. Based on my personal involvement in this investigation, as well as my conversations with other law enforcement officers, I am aware of the following:

a. On or about May 25, 2017, after the black gym bag arrived at FELIPE's RESIDENCE, and FELIPE and MIGUEL had taken it inside, law enforcement, including LA IMPACT Group 22 Det.

8

Michael Sistoni, formed the opinion that the 20 kilograms of cocaine that FELIPE intended to sell Agent Cortez had arrived and was inside FELIPE'S RESIDENCE. As a result, law enforcement conducted a "freeze" of FELIPE'S RESIDENCE, to prevent anyone from entering or leaving the house, so that law enforcement could obtain a search warrant for the search of the house. As part of the freeze, FELIPE and MIGUEL were ordered out of the house. Approximately 13 other people left the house, including three children. Once the area surrounding FELIPE'S RESIDENCE was secured by law enforcement, officers conducted a protective sweep of FELIPE'S RESIDENCE and the attached residences located 5215 A 1/4 Marmion Way and 5217 Marmion Way.

      b.    At approximately 8:50 p.m. that evening, the Honorable L. Fournier, Los Angeles County Superior Court, signed a search warrant for FELIPE'S RESIDENCE. At approximately 9:00 p.m., Los Angeles Police Department K9 Officer Matthew Wilson and his canine arrived. During a canine search of FELIPE'S RESIDENCE, the odor of narcotics was detected in several areas throughout the house. During the search that followed, Det. Sistoni discovered in the north bedroom approximately seven bindles of a white powdery substance wrapped in individual clear plastic baggies as well as a digital weight scale on top of a dresser. On top of the dresser, law enforcement found a video game station, a credit card with white residue on it, and a box of clear plastic sandwich bags. Det. Sistoni also located an additional digital scale inside the top dresser drawer. Det. Sistoni then continued his search and discovered a safe on the

floor. The safe was already opened and inside was what appeared to be a large white rock like substance inside a clear plastic baggy. In his training and experience, Det. Sistoni recognized the substance in the seven bindles, on the credit card, and in the safe to be cocaine.

      c.    Det. Sistoni also found mail in the north bedroom belonging to "Miguel TALAMANTE," two beds, clothing and accessories of a younger male, and pictures of MIGUEL.

      d.    Det. Sistoni continued his search of FELIPE'S RESIDENCE in the bedroom on the west side of the house. In the west bedroom, California Department of Justice Special Agent Brian Rose and Det. Sistoni located a brown paper bag in a drawer underneath the bed. Inside the brown paper bag was a large white rock like substance contained within a plastic bag. Based on his training and experience, Det. Sistoni concluded that this substance was cocaine. Also in this bedroom, Det. Sistoni observed mail in the name of "Felipe TALAMANTE," as well as a king size bed, clothing and accessories of an older man and woman, and pictures of FELIPE and Prodigios, his wife.

      e.    Det. Sistoni then proceeded into the walk-in closet, attached to the west bedroom, and that appeared to be used as a makeshift bedroom. Inside the walk-in closet, Det. Sistoni found what appeared to be the black gym bag that law enforcement had observed earlier in the evening. Det. Sistoni opened the black gym bag and found 20 individually wrapped packages of an unknown substance. The individual packages were wrapped with tan masking tape and appeared to weigh

approximately one kilogram each. In the closet, Det. Sistoni also noticed more men's clothing and shoes, as well as women's clothing, shoes and purses, as well as a small mattress, blankets, and sheets.

    f. Det. Sistoni conducted a field test of one of the individual packages which tested positive for cocaine.

    g. The 20 individually wrapped packages were subsequently weighed for a total of approximately 25 kilograms (or approximately 55 pounds).

    h. Nowhere in FELIPE'S RESIDENCE did Det. Sistoni locate any certifications for the operation of a children's day care.

11. Based on my personal involvement in this investigation, as well as my conversations with other law enforcement officers, I am aware of the following:

    a. Following the search of FELIPE'S RESIDENCE, Det. Sistoni spoke with FELIPE and advised him of his Miranda rights. After Det. Sistoni read him his Miranda Rights, FELIPE responded by stating, "It's all me. Leave my son out of this." Det. Sistoni explained FELIPE needed to provide a clear waiver of his rights in order to speak with Det. Sistoni. FELIPE stated, "No, I don't want to talk." Det. Sistoni ceased questioning FELIPE.

    b. Det. Sistoni then spoke with MIGUEL outside the house and advised him of his Miranda rights. In response to being advised of his rights, MIGUEL stated "I don't know, I never been arrested before. I better talk with a lawyer first." Det. Sistoni ceased questioning of MIGUEL.

c.   FELIPE and MIGUEL were subsequently arrested for possession of narcotics with intent to distribute.

### V. CONCLUSION

12.   For all the reasons described above, there is probable cause to believe that FELIPE and MIGUEL violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) (Possession with Intent to Distribute Cocaine).

/S/
---
Jason F. Gertler
Drug Enforcement Administration
Special Agent

Subscribed to and sworn before me this 7th day of ~~May~~ June 2017.

__STEVE KIM__
UNITED STATES MAGISTRATE JUDGE